The **PORT AUTHORITY OF NEW YORK & NEW JERSEY and Port Authority Trans–Hudson Corporation,** Plaintiffs,

v.

**AFFILIATED FM INSURANCE COMPANY, et al.,** Defendants.

No. CIV.A. 91–2907(JWB).

United States District Court, D. New Jersey.

May 17, 2001.

The Port Authority of New York and New Jersey by Shirley Goldstein, Esquire, Senior Litigation Counsel, New York City, Newark Legal & Communications Center by Hugh Welsh, Esquire, Newark, NJ, for Plaintiffs.

Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello by Rebecca Levy Sachs, Esquire, Newark, NJ, for Defendants Affiliated FM Insurance Company and Appalachian Insurance Company.

Zelle, Hofmann, Voelbel & Gette by Paul L. Gingras, Esquire, Michelle K. Enright, Esquire, Minneapolis, MN, Sellar Richardson by James P. Richardson, Esquire, Roseland, NJ, for Defendants American Motorists Insurance Company, Lumbermens Mutual Casualty Company and American Protection Insurance Company.

Daar, Fisher, Kanaris & Vanek by Henry R. Daar, Esquire, Lawrence D. Mason, Esquire, Chicago, IL, Connell, Foley & Geiser by John B. LaVecchia, Esquire, Roseland, NJ, for Defendant Arkwright–Boston Manufacturers Insurance Company and Columbia Casualty Company.

Feinberg & Tritsch by Bruce A. Tritsch, Esquire, Livingston, Cassiday, Schade & Gloor by A. Jeffrey Seidman, Esquire, Chicago, IL, for Defendant Allstate Insurance.

Mound, Cotton & Wollen by Stuart Cotton, Esquire, Jennifer Cheesman, Esquire, Jeffrey S. Weinstein, Esquire, New York City, for Defendants American Home Assurance Company, Birmingham Fire Insurance of Pennsylvania, Covenant Mutual Insurance Company, Insurance Company of the State of Pennsylvania, Lexington Insurance Company and Providence Washington Insurance Company.

Citibank by Thomas Lahihff, Esquire, New York City, for Defendant Citibank, N.A.

Duane, Morris & Heckscher by Gregory R. Haworth, Esquire, Newark, NJ, Ropes & Gray by Kenneth W. Erickson, Esquire, Matthew Burke, Esquire, Robert A. Skinner, Esquire, Boston, MA, for Defendants Icarom, P.L.C. and London Market Insurers.

Thurm & Heller, By Michael A. Miranda, Esquire, New York City, for Defendant Ludgate Insurance Co.

Grotefeld & Denenberg by Charles R. Tuffley, Esquire, Southfield, MI, for Defendant Pennsylvania Lumbermens Insurance Company.

Cozen and O'Connor by Richard M. Mackowsky, Esquire, Michael R. McCarty, Esquire, John J. Dwyer, Esquire, Philadelphia, PA, for Defendants Twin City Fire Insurance, Hartford Accident & Indemnity and Hartford Fire Insurance.

Hardin, Kundla, McKeon, Poletto & Polifroni by Janet L. Poletto, Esquire, Jennifer Smiles, Esquire, Springfield, NJ, for Defendant U.S. Fire Insurance Company.

Siegal & Napierkowski by Seth Goodman Park, Esquire, Cherry Hill, NJ, for

Defendant Century Indemnity Company, as successor to CCI Insurance Co., as successor to Insurance Company of North American and as successor to CIGNA Specialty Ins. Co. f/k/a California Union Ins. Co.

Clausen Miller by Charles J. Rocco, Esquire, Newark, Clausen Miller by Dennis Fitzpatrick, Esquire, Chicago, IL, for Defendant United Fire & Casualty Company.

## OPINION

BISSELL, District Judge.

This matter comes before the Court on the motion of certain defendant insurers for summary judgment on several alternative grounds all of which pertain to coverage or lack thereof under the first-party property insurance policies in effect for various periods from 1978 to 1991 ("the Policies")[1] that form the basis of plaintiff's claims.

## PROCEDURAL BACKGROUND

On June 3, 1991, the plaintiffs the Port Authority of New York and New Jersey, and Port Authority Trans–Hudson Corporation (collectively " the Port Authority" or "plaintiff") filed this action in the Superior Court of New Jersey, Law Division, Essex County, against various insurance companies that had issued first-party property insurance policies to the Port Authority between 1969 to 1988. In this suit, the Port Authority seeks to recover costs and expenses it incurred and would continue to incur from asbestos management and abatement activities in its New York and New Jersey facilities.

On May 7, 1996, the Court entered Case Management Order No. 1. due to the size and complexity of the case, the Court divided the litigation into three cumulative phases. In Phase I, the parties would address whether coverage existed under any of the first-party insurance policies named by the Port authority in its Complaint.[2]

In mid–2000, the Court considered an initial round of summary judgment motions directed to certain coverage issues. By its Opinion and Order ("the First Summary Judgment Opinion") of June 5, 2000, this Court granted partial summary judgment against the Port Authority in favor of the certain defendants, and others, on the grounds that plaintiff's claims for losses under certain insurance policies were barred due to the Port Authority's breach of contractual provisions requiring timely notice and suit within a prescribed period, and the non-issuance of an insurance policy by a particular defendant. One of the determinations in that Opinion was that, for purposes of provisions in the policies pertaining to notice of loss and suit limitations, the Port Authority was aware of its asbestos losses at the latest when it filed a lawsuit against asbestos manufacturers and distributors in 1987 ("the *Allied* lawsuit").

The present motions constitute a second round of summary judgment motions directed to several coverage issues. They

1. The Court's first summary judgment decision dated June 5, 2000 granted the defendant insurers motion with respect to late notice and suit limitations. (Op. and Order dated June 5, 2001). The ruling eliminated plaintiff's claim as to all years prior to 1978 and, as to 1978–81, limited the claim to sites in New Jersey.

2. If coverage were so found in Phase I, Phase II would be used to determine whether any of the physical loss and/or damage alleged by plaintiff occurred during the relevant policy periods. To the extent that the Port Authority prevailed in the first two phases, the parties would utilize Phase III to calculate any recovery to which the Port Authority would be entitled.

are: (a) motion for summary judgment on the insuring agreements; (b) motion of summary judgment on the ground that the Port Authority's alleged losses were not fortuitous; (c) motions for summary judgment on excluded perils (with corresponding partial joinder motion of certain defendants); and (d) motion for summary judgment on this Court's June 5, 2000 Opinion. Defendants also move *in limine* for the exclusion of certain evidence of the plaintiff generated by settled dust sampling. The Court grants this *in limine* motion, as well as that directed to the insuring agreements. Because these dispositions will result in a final judgment in favor of the defendants on all claims, the Court chooses not to address motions in categories (b), (c) and (d) above. Any party desiring that the Court adjudicate any remaining motion (rather than dismiss it as moot) shall advise the Court of that position, in writing, within 10 days of the date of this Opinion.

## DISCUSSION

### I. Standard for Summary Judgment Pursuant to Fed.R.Civ.P. 56

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.) (*en banc*), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). In deciding a motion for summary judgment, a court must view the facts in the light most favorable to the nonmoving party and must resolve any reasonable doubt as to the existence of a genuine issue of fact against the moving party.

*Continental Insurance Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982). The moving party has the burden of establishing that there are no genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Supreme Court has stated that, in applying the criteria for granting summary judgment:

> [t]he judge must ask ... not whether ... the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented. The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict ....

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" only if it will affect the outcome of a lawsuit under the applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. (*Id.*)

Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor. *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). Speculation and conclusory allegations do not satisfy this duty. (*Id.*)

Evidence with a deficient foundation must be excluded from consideration on a motion for summary judgment. *Williams v. Borough of West Chester, Pa.,* 891 F.2d 458, 466 (3d Cir.1989); *see also Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs,* 982 F.2d 884, 890–91 (3d Cir.1992).

## II. Defendants' Motion to Exclude from Consideration the Port Authority's Dust Sampling Evidence is Granted

This motion is directed to evidence related to the Port Authority's use of a so-called "dust sampling" testing at WTC and Newark Airport buildings, which it has cited in support of its contention that asbestos release occurred at insured locations during the pertinent policy years, 1978 to 1991.[3]

In all, plaintiff identified three experts who conducted these tests: William Ewing, Richard Hatfield and William Paul Heffernan. These tests were first conducted in 1996, followed by additional testing at different locations a year later, and concluded with testing at still other locations in 2000. (Stringer Aff., Exh. 2). None of the Port Authority's proffered testimony of these experts is based on dust sampling tests conducted during the years 1978 to 1991. (*Id.*)

The dust sampling tests at issue measure settled dust particles on horizontal surfaces and test the accumulations for the presence of asbestos. Particles are collected by a hand-held vacuum and later tested by an "indirect method" in a laboratory. (Stringer Aff., Exh. 3).[4] Dust sampling is different from air sampling, which measures the quantity of asbestos fibers in a measured volume of air, and tests via a "direct method."

Defendants rest their objection to this dust sampling evidence on the basis that it is both unreliable and irrelevant.

The pertinent evidentiary standards for evaluating plaintiff's proffered expert analysis are well recognized. Federal Rule of Evidence 702 and interpretive decisions govern the admissibility of expert testimony. On December 1, 2000, a proposed amendment of Rule 702 became effective. Hence, the effective language of Rule 702 reads:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the cases.

In addressing this challenge under Rule 702, the Court is guided by the decisions in *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717 (3d Cir.1994), particularly their enumeration of non-dispositive facts.

The overarching question posed by this motion is whether plaintiff's evidence and related expert testimony of dust sampling conducted years after the pertinent policy periods may be used to prove the

---

**3.** A summary of the dust samples reported collected by the Port Authority's experts is attached to the accompanying Stringer affidavit at Exhibit 2.

**4.** For further discussion of this process, *see Celotex Corp. v. AIU Ins. Co.,* 196 B.R. 973, 986 (Bkrtcy.M.D.Fla.1996).

asbestos condition of the tested locations during those policy periods. The Court determines it may not. Although a motion to exclude based on Rule 702 gives rise to a great number of potential points of discussion, exhaustive analysis of every *Daubert* or *Paoli* factor is unnecessary in this case because a number of key facts support the Court's decision to exclude the challenged evidence.

First, there is no dispute that the dust sampling evidence at issue was taken several years after the relevant periods. From the outset, this significant fact gives rise to serious concerns of the reliability of this evidence and its relevance to the pertinent policy years. Although plaintiff points to authorities that suggest that settled dust sampling is telling of past asbestos conditions in general, these references can support only speculation as to the timing and extent of asbestos released in a given period in the past. As discussed below, a more substantial showing is required under the controlling law of the Third Circuit.

Plaintiff argues that dust sampling technology was unreliable and thus unadvisable prior to 1995. This may be so; however, this limitation cannot obviate the substantial gap in time between testing and the relevant period and its attendant impact on the reliability of the dust sampling evidence in this case. Furthermore, plaintiff's opposition does not advance a basis for ignoring this problem, but rather argues that because dust sampling has been used in other cases, it is appropriately admitted in this context. This argument is unpersuasive because it does not take heed of the specific facts of the case at bar.

Second, plaintiff's own experts have conceded in their proffered testimony and in sworn testimony elsewhere that determinations made as to past asbestos conditions based upon present dust sampling testing are either unreliable, inadvisable, or unsupportable. In the proffered testimony, Mr. Ewing testified that he would not "try and go backwards" to determine "whether results of dust samples taken in 1996 are indicative of the level of asbestos in the dust in 1986," adding "in any event, I think I'd be going too far out on a limb to say [from dust sampling in 1996] what it was ten years ago." (Stringer Aff., Exh. 10 (Ewing Dep. at 188–89)). In prior testimony in another case, Mr. Ewing opined as to the limitations of dust sampling as a measure of past asbestos release, and in so doing ruled out retrospective extrapolation:

6. Based upon my training and experience in the inspection of commercial office buildings and based upon my knowledge of and experience with the characteristics of asbestos-containing fireproofing, it is my opinion that the precise date upon which the fireproofing in the 1633 Broadway building first released a sufficient quantity of asbestos fibers to contaminate the building and thereby cause a potential exposure hazard to building occupants is unknown and incapable of being ascertained.

\* \* \* \* \* \*

9. Unfortunately, air sampling does not measure the concentration of asbestos fibers on surfaces. While surface measurements can be made they cannot determine *when* a surface became contaminated, but only if the surface is contaminated at the time of sampling.

(Stringer Aff., Exh. 11 (attaching Aff. of William M. Ewing, *MRI Broadway Rental, Inc. v. U.S. Mineral Prod. Co.*, (Jan. 13, 1995), ¶¶ 6, 9)) (emphasis in original). Similarly, Mr. Hatfield's testimony is consistent with the view that dust sampling

cannot afford a reliable look into asbestos conditions in the past.

Q: With respect to a floor surface in tenant space in the tower of One World Trade Center, how far back in time prior to the taking of the dust sample do you believe you could go in offering an opinion as to the representativeness of that sample?

A: I'm not sure how far you can go back with that information. It certainly does represent some history of the area. But from dust samples, it's not really possible to pinpoint a particular start. It's in the realm of possibilities that it could have been created 20 years ago. It's in the realm of possibilities that it all got created yesterday.... You can't take the number and say, you know, it's exactly the same yesterday it was exactly the same five days before or five years ago. That's just not possible.

(Stringer Aff., Exh. 6 (Hatfield Dep. at 222)).

These statements undercut the strength of plaintiff's position that latter-year dust samplings is reliable and relevant to the question of asbestos conditions in earlier years and render dubious the grounds upon which plaintiff seeks to base the required connection.

Third, review of the record and plaintiff's arguments fails to reveal any reliable scientific methods or reliable application of any valid theory to support its proffered retrospective use of dust sampling testing results to establish asbestos conditions many years ago. Thus, plaintiff fails in its obligations under the Third Circuit's recent decision in *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 153 (3d Cir.1999). In *Heller*, plaintiff sought to establish past presence of harmful volatile organic compounds ("VOCs") in her home through the introduction of expert testimony that extrapolated backwards on the basis of samples collected after the passage of the relevant time period. Addressing a *Daubert* challenge to the admission of such evidence, the Court of Appeals held the evidence inadmissible because the expert's extrapolation was based on speculation and estimation that was subject to gross error.

The *Heller* decision is clearly applicable controlling law on this motion. The weight of *Heller* is further manifested by that decision's recognition of the then proposed (now effective) amendment to Rule 702, which now requires that "the witness has applied the principles and methods reliably to the facts of the cases." *Heller*, 167 F.3d at 153 n. 5. Although plaintiff makes a strong case for the reliability of dust sampling testing to show current asbestos conditions, this does little to support a retrospective application of the same data. As indicated above, plaintiff has advanced only a vague and speculative basis for extrapolating backward from dust sampling testing to the pertinent policy years.

In sum, the Court is persuaded that plaintiff's expert testimony based upon dust sampling testing conducted in 1996, 1997 and 2000 is unreliable for the purpose of demonstrating asbestos conditions during the policy years pertinent to this action (1978–1991). Accordingly, such testimony is excluded from the record on the concurrent motion for summary judgment on the insuring agreements.

### III. Certain Defendants' Motion for Summary Judgment Based on the Insuring Agreements is Granted

The first motion for summary judgment is brought on behalf of defendants that provided first-party property insurance to the Port Authority for the years 1971 to

1991 ("defendants" or "First–Party Insurers"). Defendants argue that the insuring agreements of the Policies do not extend coverage for the type of losses for which the Port Authority seeks recovery. In particular, defendants argue that the "all risks" first-party property insurance agreements at issue do not cover losses attributable to the Port Authority's extensive remediation efforts to abate asbestos from building materials in its numerous insured properties because, whether based on the actual release, threat of release, or mere presence of asbestos fibers, these claimed losses do not arise from a physical loss or damage.

## A. Factual Discussion

### 1. The Parties

The Port Authority of New York and New Jersey is a bi-state agency created by an interstate compact between New York and New Jersey and approved of by the United States Congress in 1921. *See* N.Y. Unconsol. Laws § 6401 *et seq.* (McKinney 1979); N.J. Stat. Ann. § 32:1–1 *et seq.* (West 1990); Act of Aug. 23, 1921, ch. 77, 42 Stat. 174 (1921). The Port Authority Trans–Hudson ("PATH") is a wholly-owned subsidiary of the Port Authority and an operator of an interstate transit system. The Port Authority is governed by a board of 12 commissioners, six being appointed by each State. N.Y. Unconsol. Laws § 6405 (McKinney 1979 and N.J. Stat. Ann. § 32:1–5 (West 1963)). The governors of both New York and New Jersey hold veto power over the commissioners' actions. *See* N.Y. Unconsol. Laws § 7151 (McKinney 1979) and N.J.

Stat. Ann. § 32:2–6 *et seq.* (West 1963 and 1988).

Defendant insurers, excluding those for whom summary judgment has already been granted, *supra* note 1, subscribed first-party property insurance policies to be in effect for various periods during the years from 1978 to 1991.[5]

### 2. The Policies

From 1978 to 1991, plaintiff placed certain first-party property insurance policies ("the Policies") with the defendant insurers. (Defendants' Rule 56.1 Statement, ¶ 1). All of the Policies contain one of the following "insuring agreements" that identify the perils insured under the Policies:

> All Risks of Physical Loss or Damage occurring during the period of this Policy including Loss of Revenue and Business Interruption, are insured against, except as otherwise specifically excluded.[6]

> All Risks of Physical Loss or Damage occurring during the period of this Policy including Loss of Revenue ... are insured against except as otherwise specifically excluded.[7]

> All Risks of Direct Physical Loss or Damage occurring during the period of this Policy including Loss of Revenue are insured against except as otherwise specifically excluded.[8]

(*Id.*, ¶ 2). The Policies define "Loss Occurrence" as "a loss or combination of losses caused by all risks of physical loss or damage subject to the perils excluded arising out of one single event," (Master Policy File, Exhs. 1–7, 20–22, 25, 27–43,

---

5. For a chart reflecting the respective coverage periods and subscribing defendants, *see* Burke Aff., Exh. 1.

6. *See* Master Policy File, Exhs. 1–7, 21, 33–42, 45–51, 56–57, 59–62, 67–73 and 77–78.

7. *See* Master Policy File, Exhs. 20, 22, 29–32, 43, 55, 58, 66 and 74–76.

8. *See* Master Policy File, Exhs. 25, 27–28 and 52–54.

45–52, 55–62 and 66–72, or "a loss by any peril or combination of perils insured against arising out of a single event,") (Master Policy File, Exhs. 53–54).

The Policies were manuscript policies that were drafted in the first instance by the Port Authority, although the record reflects that there was negotiation with the underwriters on certain provisions.[9] (Defendants' Rule 56.1 Statement, ¶ 6; Plaintiff's Rule 56.1 Response, ¶ 6). During the negotiation, the Port Authority drew from varied resources within and without the organization, including its Law Department. (Defendants' Rule 56.1 Statement, ¶ 4; Plaintiff's Rule 56.1 Response, ¶ 4). Throughout the insurance placement process, the Port Authority used experienced risk managers, an insurance broker, and in-house legal counsel to draft policy language and advise the organization. (Defendants' Rule 56.1 Statement, ¶ 7; Plaintiff's Rule 56.1 Response, ¶ 7). Although the Port Authority takes issue with the extent of their training, it nonetheless admits that professionals advised it during the placement process. (*Id.*)

### 3. The Port Authority's Claim

Plaintiff seeks coverage for losses incurred in connection with the abatement of asbestos-containing materials ("ACMS") in its insured properties under the Policies. Specifically, the Port Authority has identified 780 locations at the World Trade Center ("WTC") and 302 locations at Newark International Airport that it claims were physically damaged ("Plaintiff's List of Locations"). (Defendants' Rule 56.1 State-

ment, ¶ 9; Plaintiff's Rule 56.1 Response, ¶ 9). The Port Authority identified the "insured peril" giving rise to this alleged physical damage as "the threat of and/or release and re-entrainment of asbestos fibers from asbestos-containing materials." (Defendants' Rule 56.1 Statement, ¶ 10; Plaintiff's Rule 56.1 Response, ¶ 10).

In their motion papers, the parties dispute one another's characterizations of the type of physical damage at each of the numerous locations. (Defendants' Rule 56.1 Statement, ¶¶ 9, 11; Plaintiffs' Rule 56.1 Response, ¶ 11). Defendants classify each of the claim locations as having one or more of the following conditions: (1) the presence of asbestos, (2) the threat of release of asbestos, or (3) the actual release of asbestos. (Defendants' Rule 56.1 Statement, ¶ 9; Burke Aff., Exh. 4). On the other hand, plaintiff takes issue with the characterization of a significant portion of its claim as those for the "mere" presence of asbestos, and would rather rely on the claim descriptions reflected in P.A. 211 (Port Authority Exhibits, Exh. 211). Although plaintiff now points to P.A. Exhibit 211 as reflecting their characterization of the physical loss or damage as to each location, this recent submission cannot overcome the Port Authority's earlier representations that have framed its claims in this action. Specifically, based on its own answers to interrogatories, the Port Authority is bound to its earlier characterizations:

- Port Authority alleged that the presence of asbestos constitutes physical damage at all locations on the plain-

---

9. In the case of each of the present motions, the parties have submitted statements setting forth material facts as to which there exists or does not exist a genuine issue as well as responsive statements pursuant to L. Civ. R. 56.1. It is well established that this Court regards this procedure as a vital step in the adjudication of summary judgment motions.

Particularly when the motion involves complex facts, such as those at issue here, the Court's reliance on Rule 56.1 statements is all the more appropriate. Thus, it is incumbent on the responding party to issue a meaningful rejoinder to a given statement of material fact, lest that fact be deemed undisputed.

tiff's "single comprehensive list of the type and locations of damage." (Burke Aff., ¶ 4, Exh. 3).

- Port Authority alleged that at 801 locations the risk of threat of the release and re-entrainment of asbestos fibers constitutes physical damage.

- Port Authority alleged that at 281 locations, the actual release and re-entrainment of asbestos fibers constitutes physical damage. Port Authority contended that 180 of the alleged releases occurred "during performance of routine building functions, demolition and renovation of structures." Port Authority contended that 101 of the alleged releases occurred "under conditions that occasioned a high risk of harm to human health."

(Burke Aff., ¶¶ 2–8, Exhs. 1–4). Thus, a critical examination of the record reveals that the Port Authority's claims are indeed based upon three conditions relating to ACMS: presence, threat of release, and actual release of asbestos. Accordingly, the Court accepts the description and enumeration of plaintiff's claims as set forth in defendants' summary table, (Burke Aff., Exh. 4), which is based on the Port Authority's responses to interrogatories.

### 4. Asbestos

Although generally considered a harmful carcinogen, science tells us that microscopic fibers of asbestos are always present to some extent in the air because they are released from both natural and man-made sources. (Burke Aff., Exh. 21 (Health Effects Institute–Asbestos Research, *Asbestos in Public and Commercial Buildings: A Literature Review and Synthesis of Current Knowledge* (1991) (the "HEI–AR Report"))). It is undisputed that background levels of asbestos in the outdoor air in the New York-metropolitan area are approximately .004 to .007 fibers per cubic

centimeter (f/cc) and probably higher in downtown Manhattan. (Defendants' Rule 56.1 Statement, ¶ 15).

The Occupational Safety and Health Administration ("OSHA") regulates asbestos exposure standards in the workplace by setting so-called Permissible Exposure Limits ("PEL"), which set an eight-hour time-weighted average of airborne concentrations of asbestos fibers; currently, the PEL is 0.1 f/cc. 53 Fed.Reg. 35610 (June 20, 1986), 59 Fed.Reg. 40964 (Aug. 10, 1994). (Defendants' Rule 56.1 Statement, ¶ 17). The PEL is based on a presumed exposure to asbestos eight hours per day for 50 weeks per year over the course of a working lifetime, *i.e.*, 45 years. 29 U.S.C. § 655(b)(5); 51 Fed.Reg. at 22644–46. (Defendants' Rule 56.1 Statement, ¶ 18).

It is undisputed that the Port Authority policy on asbestos during the period in question was to "manage asbestos in place and abate only when required." (Defendants' Rule 56.1 Statement, ¶ 19).

There is substantial disagreement in the record as to the nature and extent that exposure to asbestos at various levels has on human health. (Plaintiff's Rule 56.1 Statement, ¶¶ 4, 5; Defendants' Rule 56.1 Response, ¶¶ 4, 5). Similarly, the parties dispute the issue of what conditions must be satisfied to constitute a "release of asbestos." (Plaintiff's Rule 56.1 Statement, ¶ 11; Defendants' Rule 56.1 Response, ¶ 11).

### 5. Port Authority's Plan for Removal of Asbestos from the World Trade Center

Beginning in the mid–1980s and continuing thereafter, the Port Authority at WTC undertook: (1) the removal of fireproofing and Vinyl Asbestos Tile ("VAT") from the tenant floors of Towers I and II; (2) the abatement of asbestos-containing pipe insulation from mechanical equipment rooms and other areas where maintenance work

or equipment upgrade are required; and (3) the removal of asbestos from the shuttle elevator shafts in conjunction with the modernization of the WTC elevators. In 1986, Victor Strom advised the Executive Director Stephen Berger (the Port Authority's CEO-equivalent) of the "asbestos management plan" developed for the World Trade Center.

As part of his findings, Mr. Strom reported:

> Because of staff's concern over the presence of asbestos in the 1st zone of Tower # 1, the Inspection and Safety Division has over the past several years monitored the air in the zone for asbestos fiber. Of significant note is that despite the presence of material with a high percentage of asbestos in the 1st zone of tower # 1, there has never been a single instance in which a test of the air has revealed the presence of airborne asbestos in excess of the standard promulgated by OSHA.

(Burke Aff., Exh. 23 at P545211). Mr. Strom advised the head of the Port Authority that the decision to remove the asbestos fireproofing from floors 9–40 of WTC I was based on business consideration and not health concerns. (Defendants' Rule 56.1 Statement, ¶ 21; Plaintiff's Rule 56.1 Response, ¶ 21). Plaintiff, however, maintains that human health concerns dictated all of their policies regarding asbestos, and that business considerations were not a main purpose of asbestos management either at the WTC or Newark Airport. (Plaintiff's Rule 56.1 Response, ¶ 21).

Because of tenants' desires to custom-fit their space, zone 1 floors of the WTC were difficult to market to potential tenants. (Defendants' Rule 56.1 Statement, ¶ 22). The Port Authority's WTC management department responded to this concern, and submitted to the Executive Director and Board of Commissioners a capital proposal for the removal of asbestos from the WTC as part of the Port Authority's Capital Authorization Process. This proposal called for the planned removal of asbestos over a seven-year period "to permit tenant reconstruction of these spaces, installation of fire sprinkler systems and performance of maintenance activities with minimal disturbance of asbestos materials." (Id., ¶ 23). The proposal described periodic air sampling in these areas since the completion of construction in the 1970s, "particularly during periods when ceilings were opened for construction or maintenance work." (Id., ¶ 24). The results of this sampling "did not exceed or approach the permissible level included in the 1986 OSHA regulations." (Id.) The express purpose of this plan was to stem lost revenue resulting from a loss of new tenants who wished to rebuild office space to their desired specifications, but who could not do so unless ACMS were abated. (Id., ¶ 25).

The undisputed record also reflects that in order to free up non-asbestos-containing floors, the Port Authority moved its own personnel to floors containing asbestos. Although there is evidence that limited warning measures were taken with respect to "back-of-the-house areas such as utility and elevator machine rooms," the Port Authority did not advise these employees that zone 1 floors were physically damaged or that there was a substantial health risk associated with these floors. (Defendants' Rule 56.1 Statement, ¶ 27; Plaintiff's Rule 56.1 Response, ¶ 27). Moreover, all regularly conducted air sampling in elevator cabs indicated levels "well within established guidelines for safe occupancy." (Defendants' Rule 56.1 Statement, ¶ 28; Plaintiff's Rule 56.1 Response, ¶ 28).

### 6. WTC Operation and Maintenance Program

In 1986, OSHA issued new regulations, to take effect January 1, 1987, requiring

employers to conduct air monitoring for asbestos in areas where employees worked and, depending on the results of that monitoring, to take follow-up steps. 29 C.F.R. § 1910.1001; 29 C.F.R. § 1926.1101. In spring 1986, in conjunction with its electrical, mechanical and maintenance contractors, the Port Authority established a task force to develop a plan to manage the conduct of operations and management activities in areas containing asbestos at the World Trade Center. (Defendants' Rule 56.1 Statement, ¶ 31; Plaintiff's Rule 56.1 Response, ¶ 31). The task force developed a plan that included training operations and maintenance workers, placing signs near areas with asbestos, adjustment of work methods, supplying protective equipment such as respirators, and personal air monitoring (the collection of air samples from a device attached to the worker's clothing) that analyzed over 100 different routine and non-routine tasks performed by operations and maintenance workers. (Defendants' Rule 56.1 Statement, ¶ 21). During the survey, the Port Authority gathered hundreds of test samples, and all of the results were "well below the OSHA action level of .1 fibers per cubic centimeter." (*Id.*) WTC's Assistant Building Manager and Chairman of the task force, Thomas Cancelliere, testified that based on the results of the task force survey he was satisfied that it was safe to conduct operations and maintenance activities in areas of the WTC containing asbestos and that asbestos removal was not a necessary condition to allow such activities to proceed. (Defendants' Rule 56.1 Statement, ¶ 33; Plaintiff's Rule 56.1 Response, ¶ 33).

### 7. *Port Authority's Removal of Asbestos from Newark Airport*

Thousands of air samples in the Newark Airport buildings did not reveal any in-

stances where asbestos fibers exceeded safety limits. (Defendants' Rule 56.1 Statement; ¶ 34; Plaintiff's Rule 56.1 Response, ¶ 34). The Port Authority has completed abatement projects at only a third of the locations for which it has claimed losses.

### 8. *The Port Authority's Assurances about Safety in its Buildings*

"When dealing with the public, tenants, contractors, and its own employees, the Port Authority always represented that the tested structures were completely safe," in the sense that air readings in those buildings did not register presence of asbestos in excess of regulatory limits. (Defendants' Rule 56.1 Statement, ¶ 40; Plaintiff's Rule 56.1 Response, ¶ 39). "Throughout the 1980s, the Port Authority advised tenants and contractors that it had sampled the air in the buildings for years and that all results were below the applicable OSHA standards." (Defendants' Rule 56.1 Statement, ¶ 41). "In response to inquiries from contractors, the Port Authority stated, 'Our tests, to date have shown safe levels of airborne asbestos fibers in all workplaces tested.'" (*Id.*, ¶ 42). "The Authority advised third parties that '[a]ll past air sampling during tenant alterations in Zone 1 Tower 1 at the World Trade Center produced results which were below the OSHA asbestos exposure standards,' and that '[b]ased on past experience and air sampling we do not expect the fiber counts will reach the action level where medical examinations become necessary.'" (*Id.*, ¶ 43). "The Director of Port Authority's Asbestos Control Program, Sal Samperi, wrote to all employees advising that asbestos did not pose a threat:

Air monitoring tests are conducted to insure the air quality in specific areas

containing asbestos is within the required federal standards. *All air monitoring tests taken so far at the [facility] indicate air quality well within federal standards.*

(*Id.*, ¶ 44) (emphasis in original). "The Port Authority acknowledges that 'the air quality within its buildings and structures is safe.'" (*Id.*, ¶ 45).

### 9. The WTC Bombing

On February 26, 1993, a bomb exploded in the subgrade level of WTC and severely damaged the complex. Within hours of the explosion, the Port Authority and OSHA began conducting air sampling for asbestos in all parts of the complex. The parties dispute the precise number of tests that occurred and whether every air sample conducted fell well within the safe background levels of asbestos found inside and outside the WTC prior to the explosion. (Defendants' Rule 56.1 Statement, ¶¶ 48, 49; Plaintiff's Rule 56 .1 Response, ¶ ¶ 48, 49). Nevertheless, it is undisputed that substantial air testing occurred in the WTC and that, except in the case of "occasional spikes of higher levels of fiber in the air than normal," sampling indicated conditions that were not problematic with regard to asbestos levels. (*Id.*) In addition, "the Executive Director of Port Authority advised all staff and contractors:

> [I]nitial and subsequent samples taken for asbestos at the World Trade Center Complex indicated and confirmed that the air and the surface areas of the World Trade Center are acceptable, non-toxic and that the material tested to

date at the site of the explosion is also non-asbestos and non-toxic."
(Defendant's Rule 56.1 Statement, ¶ 50).

"On March 26, 1993, the New York Department of Environmental Protection advised 'The World Trade Center Community' that, based on its testing and monitoring that began 'within one hour of the blast,' 'all data we have reviewed indicate that the air in the World Trade Center Complex is safe.'" (*Id.*, ¶ 51). "On March 24, 1993, the New York State Department of Labor advised Port Authority that the World Trade Center towers are 'safe for re-occupancy.'" (*Id.*, ¶ 52).

### B. Legal Discussion

Defendants submit that the record demonstrates that there is no genuine issue that the insuring agreements of the Policies do not extend coverage to the Port Authority's claimed losses. In determining this question, the Court must examine the language of the insuring agreement and the nature and extent of the Port Authority's loss as reflected by the record. The Court observes that this motion addresses whether coverage was triggered in the first instance, without regard to language excluding certain risks of loss.

An insurance policy is interpreted according to its plain and ordinary meaning.[10] *Ambrosio v. Affordable Auto Rental, Inc.*, 307 N.J.Super. 114, 120, 704 A.2d 572 (App.Div.1998). "[T]he words of an insurance policy should be given their ordinary meaning, and in the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability." *Longobardi v. Chubb*

---

**10.** As a federal court sitting in diversity, the Court must apply the substantive law of the forum state to plaintiff's claim. The parties have not suggested that there is a conflict of law issue here. Accordingly, this Court will apply the law of New Jersey and persuasive authorities when necessary. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

*Ins. Co. of New Jersey,* 121 N.J. 530, 582 A.2d 1257 (1990). Although traditionally courts construe insurance policies in favor of the insured, they " 'should not write for the insured a better policy of insurance than the one purchased.' " (*Id.,* quoting *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.,* 116 N.J. 517, 529, 562 A.2d 208 (1989)).

■ Under a first-party property insurance contract, it is the insured's burden to establish that its loss is within the meaning of the insuring agreement. *DNA Plant Technology Corp. v. Navigators Insurance Company,* 941 F.Supp. 42, 44 (D.N.J.1996). After the insured demonstrates a relevant loss, the burden shifts to the insurer to show that a loss within the meaning of the insuring agreement is otherwise excluded by exclusion provisions. *Princeton Ins. Co. v. Chunmuang,* 151 N.J. 80, 95, 698 A.2d 9 (1997).

### 1. Distinction Between First–Party Property Coverage and Third–Party Liability Coverage

Defendant Insurers raise an important preliminary consideration. From the outset, they draw a distinction between two types of insurance coverage: first-party property coverage, which is at issue here, and third-party liability coverage. Defendants submit that the issues presently before this Court must be resolved according to "well-recognized" principles of first-party insurance coverage, not by cases decided in the context of third-party coverage. The Port Authority does not take issue directly with this proposition, but does rely in its opposition to this motion on cases arising from both contexts.

In general, the Court believes that it is important to differentiate between the au-

thorities generated by these two types of coverage. The difference between first-party and third-party liability coverage is a subject thoroughly explored by this Court in *McNeilab, Inc. v. North River Ins. Co.,* 645 F.Supp. 525, 537–40 (D.N.J.1986); *see also Hudson Universal, Ltd. v. Aetna Ins. Co.,* 987 F.Supp. 337, 339 n. 2 (D.N.J.1997) (noting distinction between first-party and third-party insurance coverage). In that case, the court emphasized that liability insurance, which indemnifies one from liability to third persons, is distinct from first-party coverage, which protects against losses sustained by the insured itself. (*Id.* at 537–38). Indeed, liability insurance is generally characterized as creating two obligations: the duty to defend the insured, and the duty to pay a judgment against the insured. (*Id.* at 538, n. 18) (citing *Donnelly v. Transportation Ins. Co.,* 589 F.2d 761 (4th Cir.1978)). On the basis of these fundamental differences, the court determined that traditional interpretations of liability coverage apply only to claims made under third-party policies, and not to first-party losses of the insured. (*Id.* at 538 (collecting cases)); 10 Couch on Insurance § 148.46 (3d ed.) ("[T]here are significant differences between first-party and third-party insurance contexts that tend to make for a more lenient application of the threshold trigger in liability insurance contexts ....")

Although courts may choose to set aside this distinction when there is no substantive basis for adherence to it,[11] there is more than adequate justification to seek guidance only from first-party precedent when, as here, the central issue is a fundamental one delimiting the scope of coverage under a first-party insuring agree-

---

**11.** *Universal–Rundle Corp. v. Commercial Union Ins. Co.,* 319 N.J.Super. 223, 251, 725 A.2d 76 (App.Div.1999) (applying rule from first-party precedent in case involving third-party coverage when no substantive basis for making distinction was present).

ment. The decision of the Supreme Court of California in *Garvey v. State Farm Fire & Casualty Co.*, 48 Cal.3d 395, 257 Cal. Rptr. 292, 770 P.2d 704 (1989), is instructive in this regard.

In *Garvey*, the court addressed the error that is made when a court determines that coverage exists under first-party property policies based on an application of principles developed in the context of third-party coverage. (*Id.* at 399, 405–408, 257 Cal.Rptr. 292, 770 P.2d 704). Initially, the court observed that third-party coverage "must be carefully distinguished from the coverage analysis applied in a first-party property contract. Property insurance, unlike liability insurance is unconcerned with establishing negligence or otherwise assessing tort liability." (*Id.* at 406, 257 Cal.Rptr. 292, 770 P.2d 704) (internal quotations omitted). Summarizing the distinction that must be drawn, the court stated that coverage for losses under a first-party property contract is triggered by the occurrence of a covered peril, which "in traditional property insurance parlance refers to fortuitous, active, physical forces such as lightning, wind, and explosion, which bring about the loss." (*Id.*) The court continued:

> On the other hand, the right to coverage in the third party liability insurance context draws on traditional tort concepts of fault, proximate cause and duty. This liability analysis differs substantially from the coverage analysis in the property insurance context.... In liability insurance ... the insurer agrees to cover the insured for a broader spectrum of risks.

(*Id.*) Similarly, New Jersey courts have declined to apply broader, third-party principles to resolve questions of coverage arising under first-party property agreements, at the same time embracing the fundamental distinctions between these two types of coverage and acknowledging their disparate public policy underpinnings. *Winding Hills Condominium Association, Inc. v. North American Specialty Insurance Co.*, 332 N.J.Super. 85, 91–93, 752 A.2d 837 (App.Div.2000).

Accordingly, in resolving the present motion, the Court will look primarily to precedent arising from first-party property coverage, and will consider third-party liability decisions only when there is no substantive basis for making a distinction.

### 2. Construing the Insuring Agreement and Discussion of Applicable Legal Standard

As discussed above, the terms of the insuring agreements in this case, with only slight variation, extend coverage to all risks of physical loss or damage occurring during the period of this policy. Moreover, the Policies uniformly define a "Loss Occurrence" as "a loss or combination of losses caused by all risks of physical loss or damage subject to the perils excluded arising out of one single event."

Neither party asserts directly that the "all risks of physical loss or damage" language is ambiguous, however, the Port Authority has cited testimony probative of the intent of the contracting parties with respect to the meaning of the insuring agreement. This testimony is irrelevant, unless the insuring clause is ambiguous. This is not the case, however, because such language is frequently employed in commercial contexts in arranging first-party property insurance. Accordingly, the Court finds that the insuring agreement is unambiguous and will give its terms their plain and ordinary meaning. *Intermetal Mexicana, S.A. v. Insurance Co. of North America*, 866 F.2d 71, 76 (3d Cir.1989) (construing as unambiguous "all risks" insuring agreement); *see also Leafland Group–II, Montgomery Towers Ltd. Part-*

*nership v. Insurance Co. of N. Am.,* 118 N.M. 281, 881 P.2d 26, 28 (1994) (construing as unambiguous first-party property insurance policy insuring real property "against direct loss or damage"); *Fujii v. State Farm Fire & Cas. Co.,* 71 Wash.App. 248, 857 P.2d 1051, 1052 (1993) (construing property insurance policy insuring against "direct physical loss" according to its plain terms). *But see Hampton Foods, Inc. v. Aetna Cas. & Surety Co.,* 787 F.2d 349, 352 (8th Cir.1986) (construing language in favor of insured due to ambiguity and giving the insuring terms their "commonsense meaning," but not considering evidence of subjective intention of the parties).

From the outset, it should be emphasized what is at issue here. This motion is brought on the ground that the record does not support a necessary element of coverage on which plaintiff bears the burden of persuasion; *i.e.,* that the claimed losses result from physical loss or damage to the insured property. Thus, the Port Authority's claimed losses define the issue. As discussed above, a critical examination of the record demonstrates that the bases for plaintiff's claimed losses can be separated into three analytical categories: presence of asbestos, threat of release of asbestos, and actual release of asbestos in the insured properties.

 Under the plain and ordinary meaning of the insuring agreement, the Port Authority does not have a relevant loss unless caused by a risk of actual physical loss or damage. The requirement that the damage or loss be physical is central to the nature of coverage under a first-party all risks policy. The Third Circuit recognized as much when it observed that "all risk" is not synonymous with "all loss." *Intermetal,* 866 F.2d at 75. " 'The label 'all risk' is essentially a misnomer. All risk policies are not 'all loss' policies; all risk policies ... contain express written

exclusions and implied exceptions which have been developed by the courts over the years.' " *Ariston Airline & Catering Supply Co., Inc. v. Forbes,* 211 N.J.Super. 472, 479, 511 A.2d 1278 (Law Div.1986) (quoting *Standard Structural Steel Co. v. Bethlehem Steel Corp.,* 597 F.Supp. 164, 191 (D.Conn.1984)). As further explicated by an oft-cited treatise:

> The requirement that the loss be 'physical,' given the ordinary definition of that term is widely held to exclude alleged losses that are intangible or incorporeal, and thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

10 Couch on Insurance § 148:46 (3d ed.) The party claiming a loss must demonstrate that the property was physically damaged in order to trigger coverage. (*Id.; see Intermetal,* 866 F.2d at 75) (citing *Miller v. Boston Ins. Co.,* 420 Pa. 566, 218 A.2d 275 (1966)) ("[I]n an all risk policy, the insured-plaintiff's prima facie case consists of showing that a loss was sustained and that the loss falls within the risks insured against.")

 Whether plaintiffs can survive summary judgment on this issue turns on an examination of the circumstances under which asbestos-related conditions constitute physical damage to property. Lamentably, there is no controlling case on this point, and thus the Court must look to various persuasive authorities.

In *Great Northern Ins. Co. v. Benjamin Franklin Federal Sav. & Loan Ass'n,* 793 F.Supp. 259 (D.Or.1990), *aff'd,* 953 F.2d 1387 (9th Cir.1992) (unpublished table decision), insurer sought declaratory judgment under a property insurance policy that it was not responsible for costs related to asbestos removal and lost rental

income. The court held that the insured building did not sustain the necessary "direct physical loss" where the building itself remained physically intact and undamaged, and the insured's only loss was economic. A similar result was reached in *Leafland Group–II, Montgomery Towers Ltd. Partnership v. Insurance Co. of N. Am.*, 118 N.M. 281, 881 P.2d 26 (1994), where the court rejected an insured's claim under a first-party property policy for losses sustained due to the presence of asbestos in its insured property. The insured having failed to point to any event that happened during the time the policy was in effect that caused direct loss or damage to its property, the court determined that the claim was not covered within the meaning of the policy's insuring clause. (*Id.* at 28).

In addition, the Court finds instructive a number of non-asbestos cases construing the "physical loss or damage" requirement in first-party property insuring agreements and involving claims based on the threat of the occurrence of an insured peril. In *Fujii v. State Farm Fire & Cas. Co.*, 71 Wash.App. 248, 857 P.2d 1051 (1993), insureds brought an action against the property insurer to recover under a property insurance policy for imminent damage to their house caused by a landslide occurring upslope. Noting continued instability of the slope in subsequent months, the homeowners filed a claim under the policy. (*Id.*) The insureds filed suit after the insurer denied coverage because the dwelling did not sustain a direct physical loss. The trial court granted the insurers' motion for summary judgment. (*Id.*) Affirming the lower court's decision, the appellate court reasoned that because there was no discernible physical damage to the insured property during the effective period of the policy, there was no relevant loss that would trigger coverage under the insuring agreement. (*Id.; see also Bros., Inc. v. Liberty Mut. Fire Ins.*

*Co.*, 268 A.2d 611, 613 (D.C.1970) (sustaining denial of first-party property coverage where there was no physical damage to insured property, notwithstanding showing of the occurrence of a peril otherwise covered under the insuring agreement); *Cleland Simpson Co. v. Firemen's Insurance Co.*, 392 Pa. 67, 140 A.2d 41, 44 (1958) (sustaining denial of first-party property coverage where claim based on threat of occurrence of insured peril)). Even in cases where courts have found that threatened damage could trigger property coverage there existed at least some physical damage to the insured property, and, significantly, there had been demonstrated that there was an *imminent* threat of further damage. *Hampton Foods, Inc. v. Aetna Cas. & Surety Co.*, 787 F.2d 349, 352 (8th Cir.1986) (distinguishing the *Bros. Inc.* and *Cleland* decisions due to finding that insured suffered "direct, concrete and immediate loss due to extraneous physical + damage to the building").

A recent case demonstrates the marked impact that the actual physical loss requirement has on a claim for first-party property coverage attributable to the actual release of a potentially dangerous compound from building materials. In *Pirie v. Federal Ins. Co.*, 45 Mass.App.Ct. 907, 696 N.E.2d 553 (1998), insureds sued the property insurer seeking coverage for legally required lead abatement. The court sustained the denial of coverage because the impact demonstrated did not "rise to the level of a physical loss." (*Id.* at 555). The court supported its decision by reference to analogous asbestos cases. (*Id.*, citing *Great Northern Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Assn.*, 793 F.Supp. 259, 263 (D.Or.1990), *aff'd*, 953 F.2d 1387 (9th Cir.1992) (unpublished table decision) ("Similar litigation concerning asbestos supports our reasoning. Decisions of courts that have considered claims in-

volving asbestos in buildings and the need to abate asbestos under policies similarly requiring 'physical loss' are particularly instructive.")) This decision represents a strict application of the physical loss requirement.

To be sure, there are circumstances in which the actual release of asbestos from building materials can constitute physical damage or loss. When this has been the case, however, the courts have described the level of asbestos release that will constitute physical damage in terms requiring the magnitude and extent of asbestos release to be relatively substantial. For example, in *Sentinel Management Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296 (Minn.Ct.App.1997), a commercial insured brought suit under an "all risks" first-party property policy claiming it had suffered a direct, physical loss from the release of asbestos fibers and resultant contamination of its insured buildings. At trial, the record indicated that: the insured property was constructed with ACMS between 1962 and 1978; first-party coverage was taken out in 1991 and 1992; plaintiff's experts concluded that all insured buildings contained asbestos fibers on carpeting and other surfaces, released from the ACMS by abrasions from normal residential and building maintenance activities; the buildings remained occupied; and the insured had not yet taken action to remove asbestos fibers. (*Id.* at 298). On certified question from the trial court and review of its summary judgment decision, the Minnesota Court of Appeals considered whether asbestos contamination constituted a direct physical loss under a first-party property insuring agreement.

Preliminarily, the *Sentinel* court characterized the claim at issue as one for the actual release of asbestos, as distinguished from one for the mere presence of asbestos. (*Id.* at 300). Turning attention to the requirement of actual physical loss under the "all risks" insuring agreement, the court determined that "direct physical loss [ ] may exist in the absence of structural damage to the insured property." (*Id.*) In support of this proposition, the court cited *Western Fire Ins. Co. v. First Presbyterian Church*, 165 Colo. 34, 437 P.2d 52, 55 (1968), finding that the insured had suffered direct physical loss to its insured building when municipal authorities ordered the closing of the building because of the infiltration of gasoline in the soil surrounding the building, which gasoline and vapors thereof infiltrated and contaminated the building making it uninhabitable and dangerous if used. *Sentinel*, 563 N.W.2d at 300. Notwithstanding the significant concessions by the insured that it had neither closed the buildings nor abated the asbestos fibers detected, the court in *Sentinel* rejected the insurer's position that asbestos contamination, absent structural damage, cannot constitute direct physical loss under the policy. (*Id.*) The court explained as follows:

> However, [the insured] presented evidence showing that released asbestos fibers have contaminated the buildings, creating a hazard to human health. Although asbestos contamination does not result in tangible injury to the physical structure of a building, a building's function may be seriously impaired or destroyed and the property rendered useless by the presence of contaminants. Under these circumstances, we must conclude that contamination by asbestos may constitute a direct, physical loss to property under an all-risk insurance policy.

(*Id.*) (internal citations omitted). The court concluded that, on the record before it, factual issues remained concerning the existence and degree of contamination. (*Id.*)

The Port Authority cites a number of cases, in addition to *Sentinel,* that it argues develop the standard governing the question of direct physical loss under an "all risks" first-party property insuring agreement. Critical examination of these cases, however, reveals that their application to this case as argued would be unwise. First, the majority of these cases involved third-party coverage and, as explained, are presumptively inapposite to determinations of fundamental questions defining the scope of first-party property coverage. Moreover, the Port Authority offers no reason justifying departure from first-party authorities. Second, one of the two first-party cases cited, *Board of Educ. of Twp. High Sch. Dist. No. 211 v. International Ins. Co.,* 308 Ill.App.3d 597, 242 Ill.Dec. 1, 720 N.E.2d 622 (1999), is not persuasive because: (a) the court's legal analysis of the physical loss requirement is flawed because it is rooted in third-party case law; and (b) the case is factually distinct given the presence there of a number of significant facts not present in the instant case, including the fact that asbestos removal activities for which the insured claimed first-party coverage was mandated by a state statute providing for the identification, containment or removal of those asbestos materials that constitute a significant health hazard to students, school personnel, parents and visitors to such schools. (*Id.* at 623).

Based on examination of the foregoing authorities, the Court makes the following determinations concerning the governing legal standard for this motion. Claims by the Port Authority due to asbestos present in or released by ACMS in its insured properties cannot survive this motion for summary judgment, unless based on actual physical loss or damage. The required physical loss or damage attributable to asbestos will be found only in the event of either: (i) an actual release of asbestos fibers from ACMS that results in contamination of the property such that its function is nearly eliminated or destroyed, or is rendered useless or uninhabitable by the presence of contaminants; or (ii) an imminent threat of asbestos release of equal magnitude. Moreover, the conditions of physical loss or damage so described must have manifested themselves within the pertinent policy period, in this case, 1978–1991, in order to trigger coverage. *Winding Hills Condominium Ass'n Inc. v. North Am. Specialty Ins. Co.,* 332 N.J.Super. 85, 92–93, 752 A.2d 837 (App.Div. 2000). The insured bears the burden of demonstrating physical damage or loss manifesting within the pertinent policy period in order to demonstrate a relevant loss.

### 3. No Genuine Issue Exists Concerning Absence of Physical Loss or Damage Attributable to Asbestos in the Insured Properties

Turning to the record, defendants point to numerous undisputed facts that support their view that the Port Authority has not adduced evidence of physical loss or damage sufficient to survive summary judgment.

First, a significant portion of the Port Authority's claimed losses arises from the presence of asbestos, unaccompanied by even the suggestion of actual release or imminent threat of release of asbestos fibers. As explained above, these claims are insufficient to trigger coverage under the insuring agreements.

Second, the buildings at issue had continuous and uninterrupted use for the purposes for which they were intended. For many of the policy years, the Port Authority's policy was to manage asbestos in place. These facts belie the existence of asbestos contamination to the extent re-

quired to constitute physical loss or damage.

Third, the Port Authority's internal testing revealed that levels of airborne asbestos inside the test structures during the pertinent years did not even approach permissible exposure limits of asbestos promulgated by OSHA and were comparable to the background levels of airborne asbestos outside in the New York-metropolitan area.

Fourth, the Port Authority itself assured the public, its tenants, and its employees that its buildings were safe. It is of no moment that the Port Authority now splits hairs concerning the meaning of "safe." The content of its assurances to the public and others is wholly incompatible with the existence of conditions that would rise to the level of physical loss or damage attributable to asbestos.

Each of these facts conflicts with any notion that there were actual releases of asbestos rising to the level of contamination, or imminent threat of such releases within the policy periods. Taken together there is no doubt that they support a finding that there is no genuine issue concerning whether there occurred physical loss or damage attributable to asbestos under the terms of the insuring agreement within the pertinent policy years.

The Port Authority has failed to set forth specific facts showing that a genuine issue exists and that a reasonable factfinder could rule in its favor. First, plaintiff's submissions, indexed at P.A. Exhibit 211 (Plaintiff's Index of Proofs), offer proofs as to only 174 of 1,082 locations identified in Plaintiff's List of Locations, the former figure representing a meager 16% of the latter.[12] (Burke Reply Aff., ¶ 8, Exh. 1). Having submitted no evidence pertaining to 84% of the claimed locations, the Port Authority fails to create a genuine issue of fact as to their condition.[13]

Second, of the 174 locations for which proofs were submitted, 103 relate to locations in which the Port Authority has alleged physical damage based on threat of asbestos release and re-entrainment. (Burke Reply Aff., Exh. 1). According to plaintiff's Index of Proofs, abatement has taken place at only 13 of these 103 locations. Clearly, plaintiff cannot create a material issue concerning physical damage based on imminent threat of release of asbestos manifesting during the years 1978–1991 if it has failed to abate the purported threat to date.

Third, of the 71 alleged release locations, plaintiff's exhibits demonstrate that 45 of these releases occurred after expiration of the last policy. In any event, little of plaintiff's proofs pertaining to the 71 release locations relate to any year before 1987, and those that do fail to create a genuine issue. (Burke Reply Aff., Exh. 1). Accordingly, there is no fact issue as to either these 45 release locations or to any of the 71 release locations under pre–1987 policies.

Fourth, as to the handful of claims that remain, plaintiff's proofs consist of miscellaneous photographs, visual assessments, bulk samples and memoranda. This evidence does not create a genuine issue as to physical loss or damage. Quite to the

---

**12.** *See supra,* factual discussion of plaintiff's claims.

**13.** Plaintiff apparently misunderstands the function of a motion for summary judgment when in its papers it indicates "Plaintiffs are prepared to offer the same types of evidence as is shown here for more of the locations in issue." (Plaintiff's Br. at 5). Whether the Port Authority is "prepared" to submit additional evidence is immaterial. The Court is deciding this motion on the record actually submitted.

contrary, the Port Authority's own baseline air samples conducted at a number of these locations refute any suggestion that asbestos contamination occurred or was imminent. (Burke Reply Aff., ¶ 14, Exh. 2).

Its proofs falling short, plaintiff is left with nothing more than speculative and conclusory allegations. The Port Authority's arguments that its abatement program is necessary for protection of human health misses the point—the issue here is *first-party property* coverage under the policy that plaintiff has purchased, coverage which plaintiff has failed to establish.

Likewise, plaintiff misunderstands the scope of coverage under the insuring agreement for preventive measures. Measures taken to eliminate a threat are not covered except in the rare circumstances already discussed at length above, and then only to the extent necessary to abate the specific threat. Plaintiff cannot overcome the considerable lack of evidence concerning the manifestation of an imminent threat of asbestos contamination. Similarly unavailing is plaintiff's effort to characterize its abatement activities as expenses necessary to reduce a covered loss under the policy, because the prerequisite that there be a "covered loss" is not satisfied.

Finally, plaintiff's "mend the hold" position is meritless due to the fact that the Port Authority did not claim that a health hazard constituted physical damage when it initially asserted its claim; and the defendant Insurers never limited their right to decline coverage to certain grounds. Defendants reserved all of their rights. (P.A. Exhibits, Exh. 414; Burke Reply Aff., Exh. 4).

In sum, unlike the *Sentinel* decision, there are no genuine issues precluding summary judgment as to physical loss or damage attributable to asbestos in the Port Authority's properties, even giving plaintiff every favorable inference to which it is entitled. Plaintiff's *prima facie* case for coverage is lacking a critical element; therefore, summary judgment is awarded to defendant Insurers.

### *CONCLUSION*

For the foregoing reasons, defendants' motion *in limine* to exclude evidence of certain dust sampling is granted, and defendants' motion for summary judgment is also granted. Counsel for defendants are requested to prepare and circulate a form of Order embodying the decisions set forth above.