TOWER AUTOMOTIVE, INC.,
a Delaware corporation,
Plaintiff,

v.

AMERICAN PROTECTION INSUR-
ANCE COMPANY, a foreign stock
insurance company, Defendant.

No. 1:02–CV–08.

United States District Court,
W.D. Michigan,
Southern Division.

June 5, 2003.

Bryan R. Walters, Eric C. Fleetham, Mark S. Allard, Varnum, Riddering, Schmidt & Howlett LLP, Grand Rapids, MI, for Tower Automotive, Inc., a Delaware Corporation, plaintiff.

Edward W. Gleason, Keegan, Laterza, Lofgren & Gleason, P.C., Chicago, IL, Michael T. Small, Ralph M. Reisinger, Roberts, Betz & Bloss, P.C., Grand Rapids, MI, Patrick F. Geary, Smith Haughey Rice & Roegge, Grand Rapids, MI, for American Protection Ins. Co., defendant.

William S. Farr, Farr, Oosterhouse & Krissoff, Grand Rapids, MI, for Facilitative Mediator, defendant.

## OPINION

ROBERT HOLMES BELL, Chief Judge.

This insurance coverage dispute is before the Court on the parties' cross-motions for summary judgment. For the reasons that follow the Court concludes there is no coverage for the loss at issue.

### I.

The relevant facts are not in dispute. Plaintiff Tower Automotive, Inc. ("Tower")

manufactures parts for the automotive industry. Defendant American Protection Insurance Company ("American Protection") insured Tower under an "all risks" property insurance policy that expired on September 30, 1999.

Tower utilized Marsh USA, Inc. ("Marsh"), an independent insurance broker, as its agent for negotiating a renewal insurance policy for the period beginning October 1, 1999. On or about October 1, 1999, American Protection issued Tower a binder for property insurance for the period October 1, 1999 to October 1, 2000. The binder stated that with respect to the boiler and machinery coverage "a Contract Penalty Exclusion applies." An extension binder was issued on October 29, 1999, that was scheduled to expire on December 1, 1999. The extension binder also referenced the contract penalty exclusion.

On November 30, 1999, American Protection issued Policy No. 3ZG006752–02 ("the Policy"), effective October 1, 1999, and expiring October 1, 2000.[1] The Policy was issued on Marsh's form with changes made by American Protection. Attached to the Policy were the Manuscript Property Form and Endorsement No. 1. The Policy issued on November 30, 1999, made no reference to a contract penalty exclusion.

On January 4, 2000, one of the presses at Tower's Greenville, Michigan, plant suffered a failure. As a result of the failure, Tower's delivery of truck parts to Ford Motor Company ("Ford") was delayed. Ford constituted over one-third of Tower's business in 1999 and 2000. Ford advised Tower that as a result of the delay it incurred idle labor and lost production costs in the amount of $907,763.86. Ford requested compensation from Tower for its loss.

Tower reported the press failure to American Protection and submitted a claim for its losses from the failed press in the amount of $1,198,802.55, of which $907,763.86 represented the amount claimed by Ford. Through negotiations Tower was able to negotiate the amount of the Ford claim down to $600,000. Tower ultimately authorized Ford to debit its account in the amount of $600,000.

American Protection reported Tower's loss to Hartford Steam Boiler Inspection and Insurance Company ("Hartford") which reinsured the boiler and machinery coverage issued by American Protection to Tower. After investigating, Hartford Steam Boiler determined that an accident as defined under the boiler machinery part of the Policy had occurred. Hartford Steam Boiler agreed to pay that part of Tower's claim that related to overtime for Tower employees and premium freight charges. (Wilson dep. at 50–51). Payment was denied as to the amount represented by the Ford debit because it fell within the contract penalty exclusion and because the $600,000 represented a loss sustained by Ford and not by Tower. (Pranulis letter 9/21/01).

Hartford Steam Boiler did not review the Policy until after the failure of the press on January 4, 2000. Upon review, Hartford Steam Boiler learned for the first time that several of the agreed upon boiler and machinery insurance terms had been omitted from the Policy, including the definitions of "accident" and "object" and certain restrictive wording regarding the "Dies, Molds, Patterns Exclusion," the "Contract Penalties Exclusion" and the "Actual Cash Value" conditions. As soon as these omissions were discovered, American Protection and Hartford Steam Boiler

---

1. Although the Policy number on the binders, 3ZG006725–02, differs from the Policy number on the Policy itself, 3ZG006752–02, this does not appear to be an issue in this case.

prepared an endorsement to the Policy. Endorsement No. 2, which addresses all of these omissions, was delivered to Tower on January 27, 2000. Endorsement No. 2 states that it has an effective date of October 1, 1999. Under the heading "Contract Penalty Exclusion," Endorsement No. 2 states that "we will not pay for any increase in loss resulting from any contract between you and your customer or supplier. This includes but is not limited to penalties and late fees."

On December 6, 2001, Tower filed this action for breach of contract, penalty interest and waiver in the Kent County Circuit Court. Tower contends that the Ford debit was a covered loss and that the contract penalty exclusion did not apply because it was not a part of the Policy at the time of the covered incident. American Protection removed the action to federal court on the basis of diversity of citizenship. American Protection filed a counterclaim for reformation of the contract to include the contract penalty exclusion. This action is currently before the Court on the parties' cross-motions for summary judgment.

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the moving party carries its burden of showing there is an absence of evidence to support a claim then the non-moving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

## III.

The parties' cross-motions for summary judgment address the issue of whether the Ford debit is a covered loss under the Policy. Because there is a dispute between the parties over the inclusion of the contract penalties exclusion, the Court will first consider the Policy without this exclusion.

 The insurance Policy at issue in this case is known as an "all risks" policy. (Answer, ¶ 5). Paragraph 8 of the Policy at issue in this case insures against "all risks of direct physical loss or damage to covered property described herein, except as hereafter excluded." "All-risk insurance is a special type of insurance policy that, as a rule, covers every loss that may occur, except as a result of fraudulent acts of the insured." *Mull v. Equitable Life Assur. Soc. of U.S.,* 444 Mich. 508, 523, 510 N.W.2d 184, 190–91 (1994). Notwithstanding the breadth of this statement, courts are in general agreement that all-risk policies are not "all loss" policies. Under an "all risk" policy, an insured is entitled to recover for damage to the insured property regardless of the peril that caused that damage, but the term "all risk" does not

stand for the proposition that an "all risk" policy permits an insured to recover for all losses or damages resulting from the accident. *Fireman's Fund Ins. Co. v. Tropical Shipping and Const. Co., Ltd.,* 254 F.3d 987, 1008 (11th Cir.2001). All risk policies often contain express written exclusions and implied exceptions that have been developed by the courts over the years. *Yale University v. Cigna Ins. Co.,* 224 F.Supp.2d 402, 411 (D.Conn.2002) (quoting *Costabile v. Metropolitan Property and Cas. Ins. Co.,* 193 F.Supp.2d 465, 477 (D.Conn.2002)).

■ Even with an all risk policy, the burden is on the policyholder to demonstrate that the loss falls within the terms of the policy. *Yale University,* 224 F.Supp.2d at 411 See also *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.,* 245 F.Supp.2d 563, 579 (D.N.J.2001) ("[I]n an all risk policy, the insured-plaintiff's prima facie case consists of showing that a loss was sustained and that the loss falls within the risks insured against."); *Roundabout Theatre Co., Inc. v. Continental Cas. Co.* 302 A.D.2d 1, 6, 751 N.Y.S.2d 4, 7 (N.Y.App.Div.2002) (policyholder bears the initial burden of showing that the insurance contract covers the loss); *Witcher Const. Co. v. St. Paul Fire and Marine Ins. Co.,* 550 N.W.2d 1, 4 (Minn.Ct.App.1996) (policyholder must demonstrate a loss to the insured subject matter). The burden is on the insurer, however, to clearly state any exclusions. "If an insurer intends to exclude coverage under certain circumstances, it should clearly state those circumstances in the section of its policy entitled 'Exclusions.' Exclusionary clauses are to be strictly construed against the insurer." *Fragner v. American Community Mut. Ins. Co.* 199 Mich.App. 537, 540, 502 N.W.2d 350, 352 (1993) (citations omitted).

Tower contends that because this was an all risks policy, everything is covered unless it is excluded. According to Tower, the Ford claim was an extension of Tower's costs associated with the breakdown of the press. Because there was no specific exclusion of this risk in the Policy, Tower contends the Ford debit is a covered loss.

American Protection, on the other hand, contends that the kind of risk represented by the Ford claim was never intended to be covered by the Policy. According to American Protection, the Ford claim is not covered under this Policy because it represents a loss suffered by Ford and not by Tower.

It is essential to this Court's analysis to understand the nature of the Ford debit. The undisputed facts establish that when Tower's press suffered a failure, Tower's manufacturing of automotive parts for Ford was briefly interrupted. The press was promptly repaired and returned to operation, but Tower's shipment of parts to Ford was delayed. As a result of the delay, Ford incurred idle labor or lost production costs. (Jeffrey Wilson dep. at 51). Tower maintains an account with Ford into which money relating to many different purchase orders is debited and credited. (Wilson dep. at 63–64). On June 7, 2000, Ford sent Tower a letter requesting Tower to authorize Ford to debit Tower's account in the amount of $969,576. (Def.Exh. 28). On January 13, 2000, after negotiating with Ford, Jeffrey Wilson of Tower authorized Ford to debit Tower's account in the amount of $600,000. (Wilson dep. at 63–64).

Jeffrey Wilson of Tower testified that he was not aware of any contractual obligation under the purchase order or the Global Terms and Conditions that would have required that payment. (Wilson dep. at 61). His only explanation for the payment was that "Experience says you pay.

I have had this happen four or five times in my career, and I have paid in every instance." (Wilson dep. at 61). Wilson understood, based on his experience, that Tower was going to pay for the lost production whether Tower agreed to it or not. (Wilson dep. at 61). Wilson considered paying $600,000 to be the best business decision because if he did not accept the $600,000 debit, Ford would have come after Tower for a million dollars. (Wilson dep. at 62). Wilson testified that he was not concerned that the failure to pay might compromise or negatively affect Tower's business relationship with Ford. (Wilson dep. at 62). No one from Ford told him that they would consider reducing and/or withdrawing their business from Tower if he did not agree to reimburse them the $600,000. (Wilson dep. at 62). Wilson simply knew Tower would have to pay some figure, and he chose to take the lowest figure he could get. (Wilson dep. at 62).

■ This Court is required to read and interpret the insurance contract as a whole. *Fragner* 199 Mich.App. at 540, 502 N.W.2d 350 (citing *Allstate Ins. Co. v. Tomaszewski*, 180 Mich.App. 616, 619, 447 N.W.2d 849 (1989)). The Policy includes both coverage provisions and exclusion provisions. Section 7 of the Policy addresses coverage. Coverage is extended to such items as the Insured's interest in real and personal property, interruption to business conducted by the Insured, and extra expenses incurred by the insured to continue its normal operation.

■ Tower contends the Ford debit is contemplated under the "extra expense" provision of the Policy because it is an expense over and above the total cost of normal operation had Tower's press not failed, and the claim is not explicitly excluded under this section.[2]

Extra expense is defined as the expense incurred by the Insured "in order to continue as nearly as practicable the Normal operation of the Insured's business." There is no testimony that the $600,000 payment was necessary to Tower's ability to resume its normal operation after the failure of the press.

■ Tower also contends that the Ford claim is covered under ¶ 7(i)(3) which addresses expenses to reduce loss.[3] Paragraph 7(i)(3) refers to expenses necessarily incurred for the purpose of "reducing loss under this policy." Tower contends it had

**2.** *Extra Expense:*

(1) The necessary Extra Expense incurred by the Insured in order to continue as nearly as practicable the Normal operation of the Insured's business following physical loss or damage to covered property by any of the perils covered herein during the term of this policy.

(2) "Extra Expense" means the excess of the total cost during the period of restoration of the damaged property chargeable to the operation of the Insured's business over and above the total cost that would normally have been incurred to conduct the business during the same period had no loss or damage occurred.

(3) Extra Expense coverage does not insure against:

a. loss of income...

Policy ¶ 7(d) at pp. 8–9.

**3.** *Expenses to Reduce Loss:*

This policy also covers expenses which are necessarily incurred for the purpose of reducing loss under this policy (except expense incurred to extinguish a Fire); and expenses, in excess of Normal, as would necessarily be incurred in replacing any Finished Stock used by the Insured to reduce loss under this policy; but in no event shall the aggregate of such expenses exceed the amount by which the loss otherwise payable under this policy is thereby reduced. Such expenses shall not be subject to the application of any Contribution Clause.

to pay $600,000 so that it would not have to pay $1 million. Tower's argument on this point is circular. The fact that Tower might have had to pay more to Ford does not indicate that the Ford claim is a "loss under this policy."

American Protection directs the Court's attention to ¶ 7(h) of the Policy which addresses contingent business interruption and contingent extra expense.[4] While American Protection recognizes that this provision does not apply directly because it is Tower, not one of Tower's suppliers or customers, who suffered the equipment failure, the statement in this provision that "direct suppliers or direct receivers shall not be insured under this Policy" ratifies and reinforces American Protection's assertion that the Policy is a first party contract and was never intended to cover the lost production costs of Tower's customers.

American Protection also contends that coverage is excluded under the delay exclusion in paragraph 10(f).[5] Tower contends the delay provision deals exclusively with losses relating to property in transit, a situation not implicated in this case. American Protection, on the other hand, contends that the semi-colon separates this exclusion into two parts, and the first part excludes losses associated with a delay in shipping product.

American Protection also notes that Tower had a separate third-party liability insurance policy. Third-party policies protect the insured against liability to another based upon the insured's acts. If Tower had refused to pay Ford and if Ford had a legal basis for its claim, then Tower would presumably have presented the Ford claim to its third-party liability carrier rather than to American Protection.

Tower contends that the Ford claim does not constitute a third-party loss because the $600,000 debit by Ford was an extension of Tower's cost for the equipment going down. Tower contends that if this were Ford's loss, the amount of the claim would be for $1 million rather than $600,000.

Although Wilson did not say that he was threatened with the loss of business by Ford if he did not agree to the debit, and although he stated that he was not concerned that the failure to pay might compromise or negatively affect Tower's business relationship with Ford, it is clear that Wilson operated from the start with the assumption that Tower would pay some portion of the Ford claim. Tower does not provide any contractual or legal basis for the debit. The Global Agreement between Ford and Tower is silent as to any penalty for delay and there was no contract between Ford and Tower for damages for downtime.

---

**4.** *Contingent Business Interruption and Contingent Extra Expense:*

> The applicable business interruption recovery against loss resulting directly from necessary interruption of the Insured's business, caused by physical loss or damage of the type insured against solely to property of the type covered by this policy at a direct supplier of good and/or services to the Insured, or a direct receiver of goods and/or services from the Insured. **Such direct suppliers or direct receivers shall not be insured under this Policy.**

¶ 7(h) (emphasis added).

**5.** 10. PERILS EXCLUDED

> This policy does not insure:
>
> . . . . .
>
> f. against delay or loss of market; time element loss due to delay with respect to property in transit, or against business interruption loss with respect to property in transit.

Policy ¶ 10(f) at p. 18.

¶ 7(i)(3) at p. 12.

Yet, even while Tower denies that it was contractually obligated to pay the Ford debit, it nevertheless stresses that there was nothing voluntary about the $600,000 debit. Tower's agreement to the debit of its account is indisputably a business decision in order to keep good business relations. From Ford's perspective, Tower caused its damages. Ford and Tower appear to have had an understanding that Tower would satisfy Ford if Tower's actions caused Ford a loss. Tower reasonably concluded that it made good business sense to pay for Ford's losses. That was one of the costs of doing business with an important customer such as Ford with whom Tower had a long-standing relationship.

Even if agreeing to the debit was good business judgment, it was, nevertheless, a business decision. As such it was a voluntary payment, not unlike the claim rejected in *Twin City Hide v. Transamerica Ins. Co.*, 358 N.W.2d 90 (Minn.Ct.App. 1984). In *Twin City Hide* the court rejected the Insured's claim for expenses incurred by its president's overseas travel to settle a claim, to maintain customer goodwill, and to make additional sales. The court held that these expenses were clearly excluded by the provision in the policy which excluded coverage for delay, loss of market, interruption of business, and consequential loss of any nature. *Id.* at 92.

Upon review of the Policy language and evidence concerning the Ford debit, this Court concludes that there are no material issues of fact and that it is clear, as a matter of law, that the Ford debit is not a covered loss under this Policy. Reading this Policy as a whole, it is clear that it is intended to cover direct losses to Tower and that it is not intended to cover losses to third-parties. There is no way to read this Policy as an agreement to pay whatev-

er it takes to make whole all of Tower's customers who might be affected by Tower's loss.

This Court concludes that the Ford debit was not covered by the Policy.

## IV.

There is an alternative basis for finding a lack of coverage in this case. Even if the Policy without the contract penalty exclusion were to be construed to cover the Ford debit, this Court finds that the contract penalty exclusion was intended to be a part of the Policy, that the Policy should be reformed to include the contract penalty exclusion, and that the contract penalty exclusion bars coverage.

 There is no dispute between the parties that if the contract penalty exclusion was a part of the contract, it would bar coverage for the Ford loss. Tower contends, however, that its right to coverage is to be determined by the Policy that was in place on January 4, 2000, the date of the loss, and on that date the contract penalty exclusion was not a part of the Policy. Tower bases its argument on several principles that guide contract interpretation and reformation. First, a policy becomes fixed on the date the loss occurs. *Kass v. Wolf,* 212 Mich.App. 600, 605, 538 N.W.2d 77 (1995) ("the rights of insured parties are fixed at the time of the loss."). Second, the formation of a contract requires mutual assent on all essential terms. *Kamalnath v. Mercy Memorial Hosp. Corp.,* 194 Mich.App. 543, 548, 487 N.W.2d 499 (1992). And third, a contract can only be reformed to carry out the true intent of the parties. *Dingeman v. Reffitt,* 152 Mich.App. 350, 358, 393 N.W.2d 632 (1986).

The Court does not disagree with these principles. The Court does disagree, however, with the manner in which Tower has

applied these rules to the undisputed evidence in this case.

Tower sought to obtain a renewal insurance policy to provide coverage beginning October 1, 1999. Tower used Marsh to negotiate the insurance coverage from American Protection. Marsh was Tower's agent. *West American Ins. Co. v. Meridian Mut. Ins. Co.*, 230 Mich.App. 305, 310–11, 583 N.W.2d 548 (Mich.App.1998) (noting that an independent insurance agent or broker is an agent of the insured, not of the insurer). During the negotiation process American Protection advised Tower that there would be modifications in the renewal policy, including the addition of a contract penalty provision.

Jeffrey Kersten, Tower's corporate controller and a participant in the 1999–2000 insurance renewal testified that prior to entering into the binder he had an understanding of what the contract penalty exclusion was and he did not want it. (Kersten dep. at 24–28). Tower advised Marsh in a pre-renewal meeting in the summer of 1999 that it would be unacceptable for the Policy to contain a contract penalty exclusion because Tower wanted customer shutdown protection. Marsh sent a proposal to American Protection that did not contain a contract penalty exclusion. Marsh was notified by American Protection that its reinsurer, Hartford Steam Boiler, was insisting that a contract penalty exclusion be included in the renewal. Marsh advised Tower that Hartford Steam Boiler would not change its position on the inclusion of a contract penalties exclusion in the renewal policy even if Tower offered to increase the premium because it was a coverage issue rather than a premium issue. (Amyuni dep. at 79–80). After Amyuni explained this to Tower, Tower gave him authority to bind. (Amyuni dep. at 81).

The evidence is uncontradicted that early on in the renewal process Marsh and Tower understood the intent and meaning of the proposed contract penalty exclusion, that Tower resisted its inclusion in the renewal policy, but that Tower ultimately agreed to an insurance policy with the contract penalty exclusion.

The insurance binder that was issued on October 1, 1999, and the extension binder that was issued on October 29, 1999, both provided that the insurance Policy would include a contract penalty exclusion. The testimony is consistent that it was the expectation of everyone involved that when the Policy was finalized it would include a contract penalty exclusion. All negotiations as to the Policy language occurred between Randy Amyuni and Catherine Young of Marsh and Edward Fetter of American Protection. Amyuni testified that he expected the Policy would contain a contract penalty exclusion. (Amyuni dep. at 52, 55–56). Young testified that she expected that when the Policy was finalized it would include language dealing with the contract penalty exclusion. (Young dep at 83–84). No one testified that there were any further negotiations or any other discussions whereby it was agreed that the final Policy would be prepared without a contract penalty exclusion. (Amyuni dep. at 51–52; Young dep. at 49, 87–88, 217). Marsh typed up the Policy on its global forms. American Protection reviewed it, made some additions, signed it and returned it to Marsh on November 30, 1999.

It was only after the January 4, 2000, loss occurred, that American Protection realized that the contract penalty exclusion, as well as other language contained in the binder, had not been included in the final insurance Policy. American Protection issued Endorsement No. 2 on January 25, 2000, which contained the contract pen-

alty exclusion. Endorsement No. 2 states that it has an effective date of October 1, 1999.

The testimony from Tower and Marsh is that when Endorsement No. 2 was delivered, the contract penalty exclusion as written comported with their understanding of the intent and meaning of the exclusion. (Kersten dep. at 64–65; Young dep. at 66–67, 125, 234; Sparling dep. at 98–99). Amyuni testified that he was not surprised by Endorsement No. 2 when it arrived because he expected it would make its way into the Policy based upon the earlier agreement. (Amyuni dep. at 56).

Notwithstanding the overwhelming evidence of understanding and agreement, Plaintiff contends that because the contract penalty exclusion had not been drafted before the Policy was issued, the parties could not have a meeting of the minds as to its content.

Amyuni testified that in the fall, during the renewal negotiations, Mr. Fetter was unable to describe what the contract penalty exclusion was to do. Amyuni testified that he repeatedly asked for wording so that he could see what the contract penalty exclusion did specifically and because he never received the language he never came to an understanding of what the contract penalty exclusion was intended to exclude. (Amyuni dep. at 57–58, 60). Young testified that she had requested the exact wording of the exclusion and that she would have been more comfortable with her ability to explain the contract penalty exclusion to Tower, her client, if she had been provided with the exact wording. (Young dep. at 59–60). Young testified that she understood what the contract penalty was, but wanted the wording to make sure that it comported with her understanding. (Young dep. at 74). Fetter testified that he had to ask John Volle of Hartford Steam Boiler for the language of the contract penalty exclusion because it involved boiler coverage. (Fetter dep. at 83–87). Volle testified that he did not send American Protection any of the proposed language for the contract penalty exclusion until January 26, 2000. Volle had to obtain the latest updated language for the contract penalty exclusion from Hartford Steam Boiler's home office because the wording was constantly changing. (Volle dep at 249–50).

Tower contends that because the parties never had a meeting of the minds as to the precise terms of the contract penalties exclusion, no agreement existed excluding coverage for contract penalties. Tower's assertion is not supported by the case law. In order to form a valid insurance contract, there must be a meeting of the minds on five material facts:

> (1) The subject-matter to which the policy is to attach; (2) the risk insured against; (3) the duration of the risk; (4) the amount of indemnity; and (5) the premium to be paid, which must be paid at the time of the contract, or exist as a valid legal charge against the insured.

*Martin v. Lincoln Mut. Casualty Co.,* 285 Mich. 646, 649–50, 281 N.W. 390 (1938) (citations omitted). "A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Kamalnath v. Mercy Memorial Hosp. Corp.,* 194 Mich.App. 543, 548, 487 N.W.2d 499 (1992). "[A]ll the details connected with the policy of insurance need not be expressly agreed upon in order to obtain a recovery, yet a court is not justified in attempting to ascertain the contract of the parties by conjecture alone." *Martin,* 285 Mich. at 650, 281 N.W. 390.

Although the precise language of the contract penalty exclusion was not in exis-

tence before the accident, there is no question that there was an agreement regarding the risk insured against. The parties agreed that there would be a contract penalty exclusion. The parties had a general understanding of what the contract penalty exclusion meant. Marsh and Tower agreed to the inclusion of a contract penalty exclusion in the Policy even though they had not seen the language. They had a sufficient understanding of the term to bind the contract with the contract penalty exclusion. There is no evidence that the exclusion, when it was drafted, differed from the parties' pre-loss understanding of the term. There has been no showing that any material term of the contract was not understood.

American Protection contends that the Court's analysis should stop at this point because it is clear that there was an oral agreement for a contract penalty exclusion. The Court disagrees. This is not a case where the contract was left in oral form. As Tower correctly notes, the Policy superseded the binder and the binder extension. The binders themselves explicitly provide that they are temporary and would be cancelled when replaced by a policy. The parties reduced their agreement to writing and intended that the written Policy would govern the coverage issues. The Policy states that it covers the period of October 1, 1999 to October 1, 2000, and thus retroactively covers the October–November period covered by the binders. The written Policy as delivered did not contain a contract penalty exclusion. Accordingly, it is necessary to consider American Protection's argument that the contract should be reformed.

■■■■ Under Michigan law, a court may only order the reformation of a written instrument on the ground of mistake if it finds that the mistake is mutual and common to both parties to the instrument.

*Dingeman v. Reffitt,* 152 Mich.App. 350, 358, 393 N.W.2d 632 (1986) (citing *Stevenson v. Aalto,* 333 Mich. 582, 589, 53 N.W.2d 382 (1952)). Equity will also reform an instrument to express an agreement of the parties which fails through mistake of the scrivener. *Newland v. First Baptist Church,* 137 Mich. 335, 100 N.W. 612 (1904). "The burden of proof is upon the party seeking reformation to present clear and convincing evidence that the contract should be reformed in order to carry out the true agreement of the parties." *Dingeman,* 152 Mich.App. at 358, 393 N.W.2d 632 (citing *E.R. Brenner Co. v. Brooker Engineering Co.,* 301 Mich. 719, 724, 4 N.W.2d 71 (1942)).

An action to reform a written agreement rests upon a theory that the parties came to an understanding, but in reducing it to writing, through mutual mistake, . . . some provision agreed upon was omitted, and the action is to so change the instrument as written as to conform it to the contract agreed upon, by inserting the provisions omitted or striking out the one inserted by mutual mistake. Equity cannot make a new agreement for the parties under the color of reforming the one made by them, or add a provision which they never agreed upon.

*Coyne v. Simrall Corp.,* 140 F.2d 574, 577 (6th Cir.1944) (quoting *Harley v. Magnolia Petroleum Co. et al.,* 378 Ill. 19, 37 N.E.2d 760, 765 (1941)).

Tower contends that American Protection's effort to reform the contract fails because the mistake was unilateral. Tower contends that because it repeatedly requested the language of the exclusion, the omission of the contract penalty exclusion from the Policy was not a mistake, but an omission caused by American Protection's failure to provide the language.

The evidence does not support Tower's assertion that the mistake was unilateral. The record reflects that there was never an agreement to proceed without a contract penalty exclusion when the language was not provided. The expectation between the parties was always that the Policy would include a contract penalty exclusion.

 This is a classic case for contract reformation. American Protection has shown by clear and convincing evidence that the mistake was mutual. The contract penalty exclusion was specifically negotiated, and the binder provided that it would be included in the Policy. The premium was calculated based upon the inclusion of the contract penalty exclusion. Although the Policy, when it was issued, did not include the exclusion, the parties never agreed that the exclusion would be omitted. The omission was corrected through the issuance of Endorsement No. 2. Both Tower and its agent have testified that the contract penalty exclusion set forth in Endorsement No. 2, as written, comports with their pre-loss understanding of the intent of the exclusion. The Court will accordingly reform the Policy to include the contract penalty exclusion as written in Endorsement No. 2 as of October 1, 1999, the effective date of the Policy.

For the reasons stated herein Tower's motion for summary judgment will be denied, American Protection's motion for summary judgment will be granted, and judgment will be entered in favor of American Protection.

An order consistent with this opinion will be entered.

### ORDER AND JUDGMENT

In accordance with the opinion entered this date,

IT IS HEREBY ORDERED that Defendant American Protection Insurance Company's motion for summary judgment (Docket # 104) is GRANTED.

IT IS FURTHER ORDERED Plaintiff Tower Automotive, Inc.'s motion for summary judgment (Docket # 110) is DENIED.

IT IS FURTHER ORDERED that JUDGMENT is entered in favor of Defendant American Protection Insurance Company and this action is DISMISSED in its entirety.